In this case on the docket, 2-14-0945, Brandon Siebert, plaintiff's appellant, v. Eugene V. M. D., defendant at the lead. Arguing on behalf of the plaintiff's appellant, attorney Mr. Lawrence Hyman. Arguing on behalf of the plaintiff's appellant, attorney Ms. Cynthia Kisser. Arguing on behalf of the defendant at the lead, attorney Mr. Joshua Vincent. Mr. Hyman, you can proceed, sir. May it please the court. As the court well knows, there, and this court has sort of been in the forefront of medical battery issues. We look at the cases that have come down from this particular court. As you well know, there are two types of medical batteries. You have the procedural one, whereas in the Craig v. Calandra case from this district, it didn't have the authority to do this procedure. Then we have the physician one, and that's the unauthorized touching the not authorized physician, which, interesting, through the Goubard v. Jabay case, though the counsel had withdrawn it so it never really made it to an issue, but this court has said that there was a uniform agreement that unauthorized MD operate, commit trespass to the patient. And I think we have a case at bar which is, in effect, sort of one of first impression for this court, and that is the issue of the designee, which was the real issue in this case as to whether or not Dr. Sherrill designated, in fact, Dr. Lee to allow him to operate on Mr. Siebert. Did he calm him down? Yes, there's no question. And Dr. Lee's experience was what compared to Dr. Sherrill? Dr. Lee had probably 15 to 17 years more of experience than Dr. Sherrill, but it was uncontroverted that Dr. Sherrill was a reasonably well-qualified surgeon and that he could do this procedure. In fact, Dr. Sherrill was the one who was initially of that group called to see Mr. Siebert when he was first admitted with this attack, with the gallbladder attack. So over the time we get to the trial court and we have presented evidence in the case in chief, it was our position, as the court well knows, that the Pedrick standard was not met here by Judge Meyer. We believe his actions were erroneous, his ruling was erroneous. And the reason that, and it sort of merges, these two issues sort of merge together between the medical battery and the Pedrick standard. And as the court well knows, I don't have to go through what the various standards are, but you are obviously going to look at this on a de novo basis. And if you do, it is the appellant's position that there are numerous evidences of fact that Judge Meyer did not take into consideration. Now, I know the courts have, this court specifically, has discussed in the case of Halleck, where there was a statement made, and all this sort of intertwines, and I'll explain to the court why we believe that. The statement, which I will get to in a moment, but the statement of no guts, no glory, goes to the fact that when Dr. Sherrill called for assistance, and that's what the record reflects. If you glean from the record anything, you glean that when Sherrill couldn't find his field, couldn't find the neck of the gallbladder, he called, he asked the nurse, call one of my partners, and he was a senior partner, there's no question Dr. Lee had done this before. But when Lee came in, the intent of Sherrill, the original surgeon, was to have a second pair of hands because he was going to open him up. The laparoscopic view was so distorted that he couldn't determine where the neck of the gallbladder was, where the cystic duct was, et cetera. So there is evidence, clear evidence, in the record that the statements when he came in, that when Lee comes in and he walks up to the trocars, and he looks in, he has taken over the surgery. Hasn't he been designated though? No, and I'll tell you, Justice Burke, I'll tell you why. There is a conflict here, a tremendous conflict, because if you, as the record reflects, and the exhibits show that the operative report in this case, Sherrill's operative, there are two operative reports, one by Sherrill, one by Lee, but the operative report specifically says by Sherrill, after Dr. Lee cut the wrong duct, I became the assistant. Now, just before the trial, we had Dr. Sherrill, they popped up with an affidavit that Dr. Sherrill then said, oh, when he stepped into the well, the operating room, I said, oh, if you're going to take over this case, then you're the primary and I'm the second, I'm the assistant. However, however, and that's where Judge Meyer was wrong here by not letting this go to the jury. If you convert a laparoscopic surgery to an open, wasn't it kind of the procedure, at least that they would call in a second surgeon to assist? That's what it was for Dr. Sherrill, and he needed a second set of hands. When the wrong duct was cut, didn't they then proceed to an open surgery? Then they had to. Okay, so you have Sherrill who says, I can't see what I need to see, so I'm going to convert this to an open. Correct. Call for an assistant. Correct. Okay, call for an assistant. And then Lee comes in and then does whatever he's supposed to do and cuts the wrong duct. Then they start to open and then he becomes the assistant for the open surgery, whereas before that there was no assistant. There were two doctors coming in and Sherrill designated Lee to take over. That's where the evidence, Justice Burke, shows that there is no designation by Sherrill before Lee comes in. Lee's own testimony in the record shows that nothing was said by Sherrill when he walked in. Do we really have someone say, I will now designate you to come into the operating room and take over? The facts that were presented was, Sherrill says, I can't do this, I'm going to convert it to open. Lee's called and Lee says, hey, leave the troll cars in. I've done this 3,000 times. I'm board certified. I've got 30 years' experience. Let me see if I can do it. And Sherrill, instead of saying, no, I'm the doctor, I'm in charge, we're cutting him open, he says, okay, I'll leave the troll cars in. And when Lee walks in, he steps aside to see if Lee can finish the operation in the fashion that it was hopefully begun. But at that point, Lee is not an assistant. He's not even designated. Why is he not a designated? Because he has not been, he, Lee, has not been directed by Sherrill. And that's really what a designation is, to direct someone to do something. He hasn't been directed by Sherrill to go in and try to go back and laparoscopically cut the, cut out the, cut the cystic duct. And that's where the problem. Maybe he wasn't verbally directed, but by not protesting and by leaving everything the way it was, wasn't he basically allowing him to go ahead and do that? No. That's where the medical battery comes in. That's where you have a substantial variance. You have no consent to the medical procedure performed. The procedure was contrary to the injured party's will or there was a substantial variance of the procedure granted. So what you had, if Dr. Lee had actually seen the right duct, you wouldn't have him say, no guts, no glory. You don't have to have any guts to cut the right duct. Right? So his, and also there's a nurse that's there, nurse, nurse Sparks. She's sitting right there. She says she doesn't hear him say, oh, you are now, you are now the primary and I'm the assistant. And that's where the problem lies. When the affidavit was produced by this defendant, in this case, at the, at the 11th hour, and all of a sudden Sherrill from two years before is now saying and contradicts his own operative report that he doesn't become the assistant until after the surgery. That's becomes at that point, a credibility issue. That's a true credibility issue. And this court has also said it is improper to direct a verdict with substantial facts, dispute presented evidence. And that's under the cruise versus Sherman hospital case. So that, at that point, it was a, certainly on a JNOV, on a case, on a directed verdict standard. The issue was, and always will be, does the evidence, was the evidence that was presented by Siebert. So overwhelmingly favor Lee that no contrary verdict based upon the evidence could stand. And we say, no, it's not. This is not the standard. He didn't fit within the standard. And if the court recalls in Pedrick, the reason they granted the directed verdict is that the plaintiff himself was contradictory. He was waffling. He was waffling there. And there is nothing. And, and, and then you had seven other people go, oh, I don't know. There were lights were on. So here you comment on this. No guts. No glory. Yes. Of course, that was not in the record before the trial court when it made its decision on the direct verdict. Correct. Oh, it was. Oh, absolutely. It wasn't in the evidence. The trial court excluded that. The trial court had excluded that. Correct. So right. So that, that really sort of goes to the next argument that that was improperly excluded. But, but that wasn't before the court. So the issue is whether that was improperly improperly excluded or not. How are you not subject to foul child yet by not giving us a transcript of the motion eliminate where the trial judge exercised his discretion in keeping it up? I believe that what had happened that that the record, because up in McHenry County, everything is recorded. Everything's on a recording system and they take it off of the recording. But there was sufficient information. There was. I mean, we had discussed this in a motion of limine. We had discussed this then when we wanted a nurse Lejeune to testify in as to that. And we, so we renewed our motion in limine. No, you had, you had an essence. It was treated as a motion to reconsider a motion to consider. And that was also included in your post trial motion. And the trial court did address it at both terms. Right. But we don't have, you know, we have what might be. And I think you have to actually put in there a snippet or something that snippets of the trial court's reasoning from those two motions. But without having the full argument on that motion in the trial court's full reasoning on that motion. Aren't we to presume that the trial court had a valid basis of law and fact to make that ruling to keep out the statement? OK, so let's let me move on from the medical battery issue to the city. What we say is the abuse of discretion or to start with the very principle. The very first principle is, is the statement relevant? If the statement is a relevant statement, as this court well knows, you can, you must decide this as an on a de novo basis. Once the determination is made, if it's irrelevant, then it goes to, are we talking about an abuse of discretion? So what is the relevancy of the statement? We're deciding whether a statement is relevant on a de novo basis. If it's material, if it's material. If the trial court is making a decision on relevance or materiality and says, I'm sustaining, I'm overruling, whatever, we review that evidentiary ruling de novo? We review it as an abuse of discretion. You review that as an abuse of discretion, yes. But first you have to decide, the court, the trial court has to decide, was it a relevant statement? We say it is a relevant statement. And the reason it's relevant because it goes to the standard of care. The standard of care that Dr. Lee didn't follow, didn't know. And his own experts said you can't guess. Ward said you can't guess. Dr. Freed, our expert, said you can't guess. Right? But by 2010, as Dr. Freed had testified, and that statement, by the way, was unrebutted by the defense expert, that that was, in fact, the standard. That you have to follow and trace where you, the neck of the gallbladder if you can't see it. So his statement, Lee's statement, before he gets into, start to cut, is relevant as to his understanding of the standard of care. And we say it wasn't. He didn't understand the standard of care. And that has to go, and that issue of credibility as to whether or not he did or did not understand it should be going to the jury. And then I'd like to talk about the standard of care issue. Of the other issues that were raised, of course, in our brief, one of those, one of the issues is was this standard or the act of Judge Meyer of denying our motion JNOV, whether or not there was sufficient evidence to reverse the jury's finding. So we've got, you've got to go back the record, you can glean from the record, glean from the record what those standards of care are. And it was even Dr. Ward, the defense expert, had to agree that you want to be able to see something before you cut it. And that's what the whole issue in this case was. Lee never saw it. He couldn't find it. And he created a situation that was unnecessary, that would not have happened in the absence of his negligence. And that is why this Court has to look at Judge Meyer's denying of our judgment notwithstanding the verdict again on a JNOV basis. Anything further? Thank you very much. Thank you. Mr. Vincent. Good morning. May it please the Court. Josh Vincent on behalf of the defendant, Eugene Lee, MD. I'm going to focus in on the two issues I think that Mr. Hyman spent most of his time on, the directed verdict argument and the no guts, no glory comment. On the directed verdict issue, I think Justice Burke kind of make an important point about the reality of the situation. We are not standing on the bridge of a naval vessel transferring control from the captain to another officer. We are in an operating room. There is a man lying on the table with instruments coming out of his body under anesthesia. You have a physician who, in answer to your question, Justice Shostak, Dr. Sherrill was eight months out of his residency, not even a year. And you have Dr. Lee, who's 30 years of experience, 1,500 surgeries like this. And so Dr. Sherrill makes the call for help. And Dr. Lee comes in. And I don't think that any of the case law that's come out of this district or any other suggests that there has to be some formality of designation as to who is primary and who is secondary and who is an assistant and who is not. What you have here is a very broad consent form. The consent form says that the patient is allowing the doctor to have any assistant or designee determined by the doctor perform this surgery, anybody. So that's very broad. There's no consent form like that in any of the cases that have been published. Was Lee an assistant or a designee or does it matter? I don't think it really matters, to be honest with you. It's a semantic irrelevancy. But from the standpoint of the practicality of the situation, I think when he came in, he probably came in as an assistant because at that point when you look closely at Dr. Sherrill's testimony, and I'm talking specifically now about pages R99 of the transcript and 98 and 103, and at that point he says he wanted Dr. Lee to do the surgery laparoscopically if at all possible. But he thought he wanted to open and he wasn't sure if he wanted to open, so he's betwixt and between. And so when Dr. Lee comes in, I think the initial thing is I'm going to look around, I'm going to do a little more dissection, I'm going to see if we can try it. I'm going to help you. To me, that's assistance. I'm going to help you try and complete this laparoscopically, which is your goal, which all the experts agreed is the goal. And so at that point, I think he's really assisting him to complete it laparoscopically. But at the point where the cystic duct, I'm sorry, the common bile duct is partially transected, at that point now they've got open, which is what Dr. Sherrill thought he would do ultimately. And at that point, I think Dr. Lee is the designated primary surgeon. Certainly that's what Dr. Sherrill views it as at that point because he's the more experienced doctor. He made the partial dissection. He sutured it up. I think at that point that was the understanding. So I don't, you know, the fact that the nurses didn't hear what they said, the fact that he seems to be relying on the, you know, what Dr. Sherrill said in his report that, you know, up to this point, you know, I didn't become the assistant until after the duct was severed. You know, I don't know that, I don't see that it makes any difference when you look at the breadth of the consent form. The man asked for help. He had somebody come in to help. They tried to complete it the way everybody says it should be completed, and they ran into a problem and couldn't complete it, so they did it open. Stepping aside from medical battery, no guts, no glory, is that tied to the standard of care? Definitely. You know, that's his argument that he says. I mean, he says it goes to the standard of care, which I think is a rather significant statement because you have a general verdict in this case. How do we know that the jury did decide this case on proximate cause? I mean, there was a lot of testimony about the complications and the difficulty of this man's anatomy. You know, the witnesses, the nursing witnesses described the gallbladder as shrunken and almost gone. So you're talking about a very complicated anatomy with a lot of problems in there, all the adhesions, all the fat, all these other issues, inflammation. And you also have the testimony of the expert, all the experts, that in at least one-half percent of these cases when you do an open, this can happen anyway. So I think it would be, it's not like Mr. Hyman asked for a special interrogatory to determine whether the jury decided this case on no breach of the standard of care or no proximate cause, but it's a general verdict, so we have no way of knowing. And I think based on the evidence here, there is a perfectly valid, reasonable basis to say the jury could have decided this on proximate cause. They could have said, well, you know what, he was going to open anyway. It was going to have to be an open. And in at least half a percent of those cases, this happens. In fact, his own expert, Dr. Freed, conceded that even using his critical view method that he says is almost 100 percent foolproof, his people still have this happen. You know, I think the jury could have very well decided that even if Dr. Lee did breach the standard of care, it wasn't the cause. He was going to be open, and because of the difficulty of the anatomy and all the problems that were in there, the percentage chances that this has happened, or maybe the jury felt he really wasn't injured. You know, I mean, it's the suture, you know, it was partially dissected, and it was sutured up. And you do have to question, you know, what was really, I mean, I suppose the jury was. I mean, we as lawyers can say, well, he had to have stent put in and go back and have, you know, a T-tube removed for the drainage. But, you know, maybe the jury felt he wasn't injured either, that this didn't really cause an injury. Where this happens, the plaintiff's expert conceded that it happens at times, even using this critical view method. Didn't the expert, though, clarify that or condition that upon where a surgeon leaves out a critical step, not separating the neck of the gallbladder or something from something else, which I'm aware of. But I thought he clarified that to say it happens, but it only happens when a critical step is left out of the critical view. Well, he may have said that. I don't disagree with you. I think your recollection of the record may be correct on that. What I'm relying on is the fact that both experts agreed that across the board, nationally, in half a percent of these cases, it still happens, even when you're doing this surgery the way you're supposed to do it. To me, that's probably enough. I mean, there could be a critical step overlooked. There's no question that this plaintiff's expert was citing from an article that said that misperception errors do occur. I did not understand his testimony to say that the critical view method eliminates any possibility of a misperception error. I mean, how do you change that? The concept behind the misperception error that he described was that you're viewing the surgery on a television screen that's two-dimensional. Well, that doesn't change if you're doing the critical view method. You're still viewing the surgery on a television screen that's two-dimensional, and that's what the article that the expert cited says causes the misperception error. So, you know, I don't know that it was clear what critical step might have been overlooked in the critical view method, but, you know, again, to a certain extent, it's a little bit of semantics, because, you know, Dr. Ward, the defense expert, you know, talked about the technique that really seemed to describe the exact same thing. I mean, the goal being to find the point where the cystic duct connects to the neck of the gallbladder. I mean, that seems to be the goal. It's an anatomical landmark's goal. So I think a jury confronted with this could have decided on proximate cause, but there are four other reasons why I think the no guts, no glory thing was properly excluded. You know, as Justice Burke pointed out already, we really don't have a record of the hearing on the motion of limine. And when we're talking about an abusive discretion standard, I mean, this is the discretion that you as a reviewing court really entrust to the trial judges. And to not have a record of what the judge's full-blown reasoning was and what the arguments were that were made, I don't think it's fair to the trial judge to second-guess him on this thin of record. Was there a record? Was there recording of that hearing? Well, my understanding is that in the McHenry County Court, everything is recorded. I think there was some issue during the trial about the recording apparatus that plaintiff's counsel provided a court reporter to take down the transcript. So there was, and I think there is an order in the record that indicates that the judge certified the court reporter that was hired, because I don't think this record comes actually from that recording. But the hearing on the motion of limine, I assume, preceded the trial. And, you know, if that's a critical point in the appeal, then it's an important point and a burden on the plaintiff, the appellant, to get that record. You know, make sure to provide a court reporter. But there's no indication that I saw in the record that the recording mechanism was not functioning. There's nothing to indicate that to me. You just said that you assume everything in McHenry is being taped, correct? That was my understanding. It's your understanding, but then you said if it's important, they should bring the court reporter in. Shouldn't they assume it's being taped? Yeah, I'm just saying if they knew it wasn't, then, you know, if they knew there was a problem with it, then that's fine. Did anybody know there was a problem? Not that I saw in the record. And, again, I think that that's the plaintiff's burden is if there was a problem, then that should have been made. Yeah, I guess that's my question is, and I'm just asking this because we had a case not long before you of the same county and the same issue. And I'm just wondering, when he brought the court reporter in during trial, it was brought to his attention that there was a problem with the record, right? Again, they're probably in a better position to explain that because I wasn't there for that trial. I know you hate that answer when you're on the appellate court, but I was not there for the trial for that part. You know, again, there's also the possibility they could have prepared a bystander's report. I mean, even if they discovered that there was no recording and they had a court reporter, no notice, then you do a bystander's report. I mean, that's why Rule 23 provides for all that. That's correct. So, or Rule 22, sorry. I don't believe that the comment, no guts, no glory, is an admission that would fall within a hearsay exception. I think that we've made this point in our brief, so I'm not going to hammer it here. But, you know, there's so many different interpretations that you can, or spins that you can put on that phrase. I mean, from my standpoint, I think it means, you know, you persevere in the face of adversity. Aren't those different explanations of what makes it a factual issue as opposed to a legal issue? Well, I think from the standpoint of the trial judge, and I can understand your perspective on that. Yeah, maybe we should let him, make him explain it. What did he mean by it? I can understand that question. But I think from the standpoint of weighing, number one, what does it mean? It's unclear. It could be interpreted by the jury as something very prejudicial and arouse the passion that he was being cavalier, which is what I think they're suggesting here. I think from the standpoint that it has, there's no context to the remark because nobody heard what the nurse, Lejeune, said she did hear the doctor speaking before this comment was made, but she did not hear what they were talking about. So there's that issue. So there's nobody to really say what the conversation was. And I think ultimately what really, you know, pins it, you know, on the side of why the judge, I think, reasonably exercised his discretion here is because it's really, it's not probative of the issues in the case. And when you look at the jury instructions that were given, and specifically the issues instruction, which is in C1082, you can see that the only issue that the jury was, there's three there, but the only one, they all describe the same thing. There are three different ways of saying the same thing, which was that the, that Dr. Lee used the wrong technique, that he used the wrong, and that was the focus of the expert testimony. But whether he made a mistake as to which, or wasn't sure which duct he was gutting, you know, it's admitted that he cut the wrong duct. I mean, that was a given in this case. So there was clearly some uncertainty. I mean, that's already a matter of the case. But it's not against the standard of care to go in and cut, thinking you're going for the right duct. That's right. Regardless if you say, oh, hell, no guts, no glory, I'm going for it. Exactly. And that's why there's this disconnect between, you know, the comment and what the issues were in the case. And I think that's, that's why I think, that's one of the reasons I think the transcript of the hearing of the motion in Limine is really kind of important in this case, is to have a good understanding of what the trial judge was thinking and his reasons. Now, you know, he did give a short summary, and it does touch on these points, but it's not really fleshed out. And, again, I just don't think it's in fairness to the trial judge, who confronted the issue and decided it, to not have a complete record on all of his reasoning for how he ruled, instead to just look at what is essentially about eight or ten lines in the transcript where the plaintiffs asked him to reconsider this, just as Nurse Lejeune is about to take the stand as being admonished not to make the comment. That's all we got. The only other issues that I think counsel touched upon was the J&OB issue. And to me, this case is a pretty classic battle of the experts. I mean, the experts were on either side of the question, pretty clear jury question on that. I think unless, you know, unless the court has, I just want to take a look at my notes real quick, but I don't think I have anything else I want to throw into this. Oh, there was one other point, and I think that goes to your question, Justice Spence, on the no guts, no glory. And that is, there was this testimony in the sidebar in the deposition from Nurse Lejeune that the doctor made this statement on other occasions to other residents in other surgeries, which, again, points to the disconnect as to how this is not probative of what was going on in the surgery here. That seems to indicate that the comment is something along the lines of have confidence in your skills, persevere in the face of adversity, you know, try hard, that kind of thing. It's a pep talk, and it's something that he does apparently on multiple occasions with other, as the nurse said, residents, junior physicians, this is part of his, you know, like I said, a pep talk that he gives people. So I think that that is another reason why it's a step removed from whatever was happening in the surgery, that it really didn't have anything to do with whether he was guessing or not, you know, about what he was going to cut. I think it really had to do with telling this guy, hey, you're eight months out. Have a little more confidence in your skills. Sometimes you've got to press on a little bit and see what you can do. I hope he still uses that. I hope not. Quick question about that. In the plaintiff's brief, they referred to Dr. Lee's stated preference for not converting from a laparoscopic surgery to an open surgery. Is that stated preference, is that just that comment that's used over and over in other surgeries and so forth, or is there otherwise a stated preference? It could be. No, didn't he state at other times, yes, this is my preference. I like to convert from laparoscopic to open. I don't know. Well, the nurse may have attributed that to him. I'll be honest with you, I don't remember testimony like that. There wasn't any testimony about that in the trial, but it may have come out of the deposition. That's possible. But, again, I would go back to the point that I think the trial judge had to focus on, which was what are the issues in the case, and the bias, the supposed bias in favor of not opening, trying to complete them laparoscopically, was not one of the issues in the case. It's not an issue. The issue was technique. The issue wasn't that there was something wrong with having a bias in favor of doing them laparoscopically. In fact, all the experts agreed that is the preferred method. I mean, there's less risk of morbidity and mortality. There's quicker recovery. That's the way they want to do it. So for him to have that bias, you know, that's a bias that both experts shared, too. So, again, it just wasn't appropriate of the issues in this case. Unless you have other questions, we would ask that you refer them. Thank you so much. Thank you. Ms. Kisser, is it my understanding you want to present rebuttal? Yes, ma'am. You can step forward again. Thank you. May I please support counsel? I just want to hit on a few things here. First of all, there is what's called a ghost surgery in medicine, and a ghost surgeon in medicine is when a surgeon comes in who's not named on the consent and performs the surgery without the patient's knowledge. Now, in fact, you are standing on a bridge when you are in a surgeon room because there can only be one primary surgeon, and that is the surgeon that is in charge, and everyone has to immediately know when something happens who to look for and what to say. Lee says in his testimony that he came in and he became their primary surgeon as soon as he started dissecting. Cheryl could not have come in concurrently with the primary surgeon because you cannot have two, and Cheryl basically became the assistant. What about the consent here? Does it really matter because of this very broad consent? That's a problem because you could let a janitor in to become the surgeon under this consent. If you're going to say a designee is an assistant, then Lee came in not as an assistant but took over as a surgeon. So if designee is helper, then Lee was not the helper because he became the primary. If it means that it has to be the primary, then you can only have one surgeon. And the reason this is important is because the consents have to make clear who's in charge at all times, and if Lee's name was not on that consent, then there had to be a handoff. There had to be something affirmative. You can't just say, oh, you've come in, you think you can help, I'll just stand back. And the inference that they're not entitled to is that Cheryl could not complete the surgery. It is a binding admission on them, a judicial admission that he was qualified. He made the decision to convert to an open, and he's clear about that because he felt it was not safe to continue. Lee came in, took over the surgery. He stepped back passively. Lee ran into the same problem that he ran into. So let's talk about that passive behavior. Didn't that then set forth almost a consent to go right ahead and do what you have to do? If that's what this court wants to decide, that any surgeon who comes in and bowls his way into a surgery can take over because you don't call security guards. I mean, what was a surgeon supposed to do? He called for help, did he not? He called for help, but he didn't call Lee. He called his office because he wanted a second pair of hands to hold back the walls of the abdomen and to be able to kind of help him to see. He did not call for a primary to replace him. Didn't Lee ask for the trocars to remain in place and not open him up yet? Yes, so that he could see, so he could get a good visualization, because you do get a visualization because air has gone into the abdomen and it's swollen up. But at a certain point, Lee made the decision that he was going to go ahead and complete it laparoscopically. He didn't have the authority, the okay from the primary to do that. He just did it. So it really was passive. And if that's what you want to say a consent means, that anybody who's called in to help can take over, I think that's a very dangerous precedent to set. So when Lee stepped in and said he was going to take over, what did, was it Shero? When he stepped in, what did Shero do? Okay, what happened was he came in, he said, move over. He looked, he picked up the trocar so he could see into the abdomen. He then just started dissecting. Lee, I mean Shero, didn't say anything, didn't say, I'll let you take over, anything. Lee is adamant that nothing was said at all from Shero. And the surgical consent shows that Shero became the assistant after the injury. So Lee was operating as a primary without any consent because the surgical report that Shero did says he made him the primary after the accident. So it truly is. So it comes back to the consent form. The consent form in terms of what does designee mean? Are you going to say it's passive? Anybody who comes in and says, I think I can help? Or is it going to be something where the primary, who is the one in charge under the medical canons in charge of the patient, has got to make a determination in his mind that he's passing off the care to another patient? Because that's really what primary means, that there is a, and it is truly, standing on a bridge. It is not, you know, two people sitting around working on a car and saying, I think, you know, this carburetor could be cleaned. Was Shero at fault for stepping back and allowing Lee to do this? Well, Shero should have. Did you sue Shero for any type of malpractice? We did not sue Shero because he's not the one that made the mistake cutting the duct. Well, but he, I'm going to guess that if Shero had stepped back and allowed the janitor to come in, you might have sued Shero. Correct. So he steps back to allow a senior, qualified, board-certified internal surgeon, general surgeon to come in and do this? No, he didn't call him to come in and do it. He called him in as an assistant. It's very, very clear. Now, if he waffled then on his cross, well, yes, it was okay with me that he did it. He called in to get a second care hand. His testimony throughout was that this guy never exceeded what he was allowing him to do, that Lee never exceeded what Shero was allowing him to do, correct? Other than this report that you're pointing to, his testimony, his affidavit, everything that we have from Shero is that Lee never exceeded what Shero was allowing him to do. But that affidavit was produced in anticipation of trial two months before trial by defense attorneys that Shero did not write it. Shero never saw it before he signed it? But Shero's testimony at trial. I'm talking about it all. I'm talking about everything you have from Shero, whether it's an affidavit, deposition testimony, testimony at trial, everything points to the fact that Lee did not go past what Shero was allowing him to do other than perhaps this affidavit report. I would say that he did not go past what Shero prevented him from doing, but he certainly went past anything that Shero designated him to do or determined that he wanted him to do, and that is the cusp of the matter right there. I just really want to say on the record, because I know the time went off, the trial court said there was an adequate record in the trial court for the motion to eliminate issue, and he said that when we revisited it again on the post-trial motion. I also just want to, so I think that we properly preserved that. Well, the fact that the trial court says, I remember what we argued, doesn't help us at all. He said there's an adequate record. He said there's an adequate record. He's the one that said it is an adequate record. For his purposes. Right, for his purposes. For us. Well, the same arguments were made in the trial as were made in the motion to eliminate, which was that this is a party admission. It should get in. That's basically it. You can see that from the motions. This is not like this was a convoluted legal issue. This was simply he said no guts, no glory. It's an admission. You know, it should get in, and he says, no, it's not going to get in, and why? Why did he say it's not going to get in? Well, that's interesting. That's very interesting because what he says was it implies he's shooting from the hip. So shooting from the hips means you don't really know for sure the territory you're going into, what you're aiming at, what's in your sights, and that goes to the standard of care because Lee said no guts, no glory just before he cut the wrong duct when he already knew he had poor visualization. He already knew that Dr. Sherwood disagreed with him because that's in the trial record, that he disagreed with him and he did not want him to go to an open. That actually is in the record, and so what he did is he made the very same mistake that Sherwood was afraid was going to happen because it was poor visualization. Now, when you open up, and I want to go to this because defense said this, when you convert to an open, you're not looking at a camera anymore. You're not 2D anymore. You're 3D, and you can put your hand in, and you can feel where the duct is, and you can lift the liver up if you need to before you cut it, and that is why our experts said the prevailing standard of care today is not tracing, seeing as far as you can, looking at a 2D image, and cutting. It is if you are not absolutely sure of what you're seeing there, then go to another method, and if you have to open to do it, so be it because it's far better to open than to cut the wrong duct and have this contamination coming through from what's in the duct and then having to have this poor Mr. Sherwood go through all these other procedures, which he had to go through to have the stent repaired. So just wrapping up, we have a jury verdict here, and we have two different experts saying two different things. How do we second-guess the jury? Because Ward never said that the standard of care requires critical view. He never said that was wrong. He never rebutted Freed. Freed's testimony is unrebutted. Ward was talking about the standard of care that Lee was taught in 1981. Now, as far as he went before he made the mistake, Lee was within the standard of care because he was using a tracing method. But when he got to where he had to guess, that's where he should have backed off and then applied the critical view. It's not just because somebody is within the standard of care at one point does not mean that they stay within that standard of care or they are excused or get out of jail free card when they then deviate. So the deviation occurred when he couldn't see and he made the error. But he used the tracing method. The tracing method was okay because at that point he could see. So he was able to see and feel and identify through the camera.